**Exhibit D**

CASE NO. 07-56684

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

WILLIAM BARNICK, on behalf of himself
and others similarly situated,

Plaintiff-Appellant

v.

WYETH, et al.,

Defendants-Appellees

_____

On Appeal from the
United States District Court
Central District of California

_____

BRIEF OF PLAINTIFF/APPELLANT
WILLIAM BARNICK

_____

James A. Jones
**GILLESPIE, ROZEN, WATSKY & JONES, P.C.**
3402 Oak Grove Ave.
Suite 200
Dallas, Texas 75204
Telephone:   (214) 720-2009
Facsimile:    (214) 720-2291

*Attorney for the Plaintiff/Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

    CASES: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

    STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vi-

    REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vii-

    RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ix-

    OTHER AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ix-

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -x-

Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -x-

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Defendant-Appellee Wyeth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Plaintiff-Appellant William Barnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    How Pharmaceutical Companies Such as Wyeth
        Sell and Distribute Their Products . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    How Pharmaceutical Companies Such as Wyeth Promote Their Products
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    The Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    The District Court's Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      California's Overtime Pay Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      The California Labor Code Outside Sales Exemption . . . . . . . . . . . . . . . . 20

      The FLSA's Narrow Construction of the Outside Sales Exemption . . . . . 24

      The California Supreme Court's Narrower Construction
          of the Outside Sales Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      The District Court Improperly Adopted a Definition
          of "Selling" Under the California Wage Order that is
          Less Protective of Employees than the FLSA . . . . . . . . . . . . . . . . . . 36

      The District Court's Improper Elevation
          of Policy Over the Terms of the Exemption . . . . . . . . . . . . . . . . . . . 38

      The District Court's Flawed Analysis of *Nielsen* and The Sales Exemption
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

          Use of Sales Nomenclature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

          Incentive Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

          Working Without Supervision Does Not Equate to Selling . . . . . . . 48

          Not Every Company That Sells Can Claim An Exemption . . . . . . . 49

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Statement of Related Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

**CASES**:

*Alvarez v. IBP, Inc*., 339 F.3d 894 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 19, 40

*Armenta v. Osmose, Inc*., 135 Cal.App.4th 314 (2005) . . . . . . . . . . . . . . . . . . . 20

*Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*California Grape & Tree Fruit League v. Industrial Welfare Commission*, 268 Cal. App. 2d 692 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 33

*Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005) . . . . . . . . . . . . . 21

*Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005) . . . . 14

*Gattuso v. Harte-Hanks Shoppers, Inc*., 2007 WL 3243861 (Cal. Nov. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Harris v. Superior Court*, 2007 WL 2325580 (2007) . . . . . . . . . . . . . . . . . . . 13, 14

*Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377 (6th Cir. 1970) . . . . . . . . . 42, 45

*In re Brand Name Prescription Drug Antitrust Litigation*, 186 F.3d 781 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 31

*Jewel Tea Co. V. Williams*, 118 F.2d 202 (10th Cir. 1941) . . . . . . . . . . . . . . . 38, 39

*Keyes Motors v. DLSE* (1987) 197 Cal. App. 3d 557 . . . . . . . . . . . . . . . . . . . . . . 47

*McIntosh v. Aubry (Pricor, Inc.)*, 14 Cal. App. 4th 1576 (1993) . . . . . . . . . . 14, 19

*Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (Cal. 2000) . . . . . . . . . . . . . 40, 41

*Nielsen v. Devry, Inc*., 302 F. Supp. 2d 747 (W.D. Mich. 2003) . . . 11, 41, 43, 44, 47

*Nordquist v. McGraw Hill Broadcasting Co.*, 32 Cal. App. 4th 555 (1995) . . . 15, 20

*Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203 (9th Cir. 1995) . . . . . . . . . . . . . 3

*Paykar Constr., Inc. v. Bedrosian*, 71 Cal. App. 4th 803 (2nd Dist. 1999) . . . . . . 21

*Perine v. ABF Freight Systems, Inc.*, 457 F.Supp.2d 1004 (2006) . . . . . . . . . . . 45

*Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785 (1999) . . . 15, 20, 34-37, 40, 43, 46

*Skipper v. Superior Dairies, Inc.*, 512 F.2d 409 (5th Cir. 1975) . . . . . . . . . . . . . 19

*Special Devices, Inc. v. OEA, Inc.*, 117 F.Supp.2d 989 (C.D. Cal. 2000) . . . . . . 22

*The Regents of the Univ. of California v. Hansen*, 1999 WL 33268423  (E.D. Cal. Nov. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Stout*, 1990 WL 121349 (E.D. Pa. Aug. 17, 1990) . . . . . . . . . . . 22

## **STATUTES**:

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1332(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1332(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1441(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1441(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. §218 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. Bus. & Prof. Code §§ 17200 - 17208 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

Cal. Lab. Code § 1194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

Cal. Lab. Code § 1197 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 40

Cal. Lab. Code § 1199 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 40, 41

Cal. Lab. Code § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 41, 43, 44, 47

Cal. Lab. Code § 202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 45

Cal. Lab. Code § 203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 42, 45

Cal. Lab. Code § 226.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21

Cal. Lab. Code § 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 21, 31, 47

Cal. Lab. Code § 512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 45

Cal. Lab. Code §1171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fair Labor Standards Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

## **REGULATIONS**:

29 C.F.R. § 541.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

29 C.F.R. § 541.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 34-37, 40, 43, 46

29 C.F.R. § 541.503(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29 C.F.R. § 541.505(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29 C.F.R. § 541.506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §504(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §504(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §541.500(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §541.503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §541.503 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §541.504(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. §541.504(a) (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. §541.504(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

29 C.F.R. §541.504(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

29 C.F.R. §541.504(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28, 29

29 C.F.R. §541.504(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. §541.505(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. §541.505(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 C.F.R. §541.505(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

29 C.F.R. §541.506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

Cal. Code Regs. tit. 8 §11010 2(J) ("Wage Order 1-2001") . . . . . . . . . . . 21, 22, 26

**RULES**:

Fed. R. Evid. 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 40

Fed. R. Evid. 201(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 41, 43, 44, 47

Fed. R. Evid. 201(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 201(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## <u>OTHER AUTHORITIES</u>:

*Black's Law Dictionary* 972 (5th ed., 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Black's Law Dictionary* (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Black's Law Dictionary* (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22121 (April 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

DOL Fact Sheet #17F: *Exemption for Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*DOL Field Operations Handbook*, 7/28/65, ¶22e04, at WH66-89 . . . . . . . . . 29-30

*Oxford English Dict.* (2d ed. CD-ROM 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Webster's 3rd New World International Dictionary*, unabridged edition, G + C Merriam & Co (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Webster's Unabridged New International Dictionary* 1682 (2d ed., 1961) . . . . . 22

## Statement of Jurisdiction

(A)    Plaintiff-Appellant William Barnick brought this wage & hour class action case in the Superior Court of the State of California for the County of Los Angeles, pursuant to California Labor Code §§ 201, 202, 203, 226.7, 510, 512, 1194, 1197, and 1199 seeking proper overtime compensation, unpaid meal and rest period compensation, injunctive and other equitable relief, and reasonable attorneys' fees and costs, and pursuant to California Business & Professions Code §§ 17200 - 17208, seeking injunctive relief, restitution, and disgorgement of all benefits defendants enjoyed from their failure to pay overtime and meal period compensation. Defendant-Appellee Wyeth removed this case to the United States District Court for the Central Court of California in accordance with 28 U.S.C. § 1441(b) on the basis of the Class Action Fairness Act of 2005 and satisfaction of the amount in controversy requirement. 28 U.S.C. § 1332(d). Plaintiff Barnick, at the time this action was commenced was (and is) a citizen of the State of California. Defendant Wyeth, at the time this action was commenced, was (and is) incorporated in the State of Delaware with its principal place of business in the State of New Jersey.

(B)    Plaintiff-Appellant Barnick appeals the district court's grant of summary judgment dismissing all of his claims against Wyeth. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

(C)    This is an appeal from a final judgment entered by the district court on October 26, 2007. Notice of Appeal was filed on November 16, 2007.

(D)    This is an appeal from a final judgment that disposes of all parties' claims.

## Statement of Issues

> Did the district court err when it held that William Barnick, while employed by Wyeth as a Pharmaceutical Representative, was exempt under California's mandatory overtime laws as an outside salesperson?

In the
United States Court of Appeals
for the Ninth Circuit

————————————————

No. 07-56684

————————————————

William Barnick, on behalf of himself
and others similarly situated,
Plaintiff-Appellant,

vs.

Wyeth, et al.,
Defendants-Appellees.

————————————————

On Appeal from the United States District Court for the
Central District of California
————————————————

Statement of the Case

     William Barnick is a former Pharmaceutical Representative employee
of Wyeth Corporation.  Wyeth misclassified Mr. Barnick as exempt from overtime
laws and thus did not pay overtime wages as required by California law.  Barnick
brought this case as a class action on behalf of himself and all similarly situated
Pharmaceutical Representatives to recover unpaid overtime wages.

This action was filed in the Superior Court of the State of California in and for the County of Los Angeles on May 9, 2007. (CR Tab 1). On or about June 14, 2007, Wyeth removed this matter to the United States District Court for the Central District of California. (CR Tab 1). On October 26, 2007, the district court granted summary judgment for the defendant. (ER Tab 51). This appeal was timely filed on November 16, 2007. (ER Tab 54).

<u>Statement of Facts</u>

<u>Defendant-Appellee Wyeth</u>

Defendant-Appellee Wyeth ("Wyeth"), formerly American Home Products, is a Delaware corporation with its principal place of business in New Jersey engaged in the discovery, development, manufacture, distribution and sale of pharmaceuticals, consumer healthcare products and animal health products.

(ER Tab A, p. 6).[1]  Wyeth primarily distributes those pharmaceutical products

through wholesalers, pharmacies and hospitals.  (ER Tab A, p.8).

<u>Plaintiff-Appellant William Barnick</u>

Plaintiff-Appellant William Barnick ("Barnick") was employed by

Wyeth from 1980 through approximately February 28, 2006. (ER Tab 27, p. 2, ¶

2).  He held various titles, including Sales Representative, Territory Manager, and

Professional Territory Manager.  (ER Tab 27, p. 2, ¶ 2).   From May 9, 2003 to the

---

[1]      Defendant Wyeth's Annual Form 10-K Report for 2003 (ER Tab A)
was filed with the Securities and Exchange Commission on March 12, 2004.
Because this document is not formally part of the record below, Plaintiff requests,
pursuant to Fed. R. Evid. 201(d), that this Court take judicial notice of this
document, *see id.* 201(f) ("[j]udicial notice may be taken at any stage of the
proceeding"), specifically its description of Wyeth's markets and distrubution and
the pressure exerted on sales and pricing by managed care groups and other large
health care providers as set forth on page 12, as ascertainable adjudicative facts.
*See Biggs v. Terhune*, 334 F.3d 910, 915 n.3 (9th Cir. 2003) (taking judicial notice
on appeal of statements made in administrative hearing transcript pursuant to Fed.
R. Evid. 201); *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir.
1995) (taking judicial notice on appeal of an administrative decision and order),
*rev'd on other grounds*, 520 U.S. 548 (1996*); see also* Fed. R. Evid. 201(b) & (e).
This document and the statements contained on page 8 and 12 illustrate Wyeth's
view of who it sells its products to – *i.e,* managed care groups, health care
institutions, and the like – and the competitive pricing pressure created by those
groups and institutions. Thus, this information is relevant to whether Plaintiff is in
any manner involved in sales given that Wyeth admits that its primary sales are to
wholesalers, pharmacies and hospitals. The facts contained in Wyeth's Form 10-K
Report are "indisputably accurate" as they are Wyeth's own statements contained
in a publicly filed document with a federal regulatory agency. Fed. R. Evid.
201(b)(2).

end of his employment, Barnick worked in the San Diego area, and his territory included East San Diego County, Southeastern California, and Southwestern Arizona. (ER Tab 27, p. 2, ¶ 3).  As a Territory Manager and Professional Territory Manager, Barnick was primarily responsible for "detailing"[2] Altace, a prescription drug used to reduce blood pressure, stroke and heart disease, and Protonix, a prescription drug used to reduce and prevent gastrointestinal reflux disease.  (ER Tab 27, pp. 2,3 ¶¶ 5,7).[3]

---

[2]    "Detailing" refers to Pharmaceutical Representatives such as Barnick meeting with doctors and providing information about Wyeth products to those doctors in an attempt to influence the prescribing behavior of doctors in the hope that they will prescribe Wyeth products.  (ER Tab 27, p. 2, ¶ 5).

[3]    Sixty to sixty-five percent of Barnick's working time was spend detailing Altace and Protonix.  (ER Tab 27, p. 3, ¶ 7). The other 35-40% of his time was spent providing healthcare professionals with information about Prevnar, a vaccine to prevent childhood meningitis, or until November of 2003, FluMist, a vaccine to reduce and prevent influenza.  (ER Tab 27, p.2, ¶ 5).  Barnick's calls to pediatricians were brief; a call to a pediatrician would take anywhere from a few minutes to no longer than 12 minutes.  (ER Tab 27, p. 2, ¶ 5).

On some occasions Barnick provided pediatricians or their staff with order forms provided by Wyeth to order doses of the vaccines.  If Barnick did not have an order form with him, he gave the pediatrician or his or her staff an 800 number to order specific vaccine dosages from Wyeth.  (ER Tab 27, p. 3, ¶ 6). About 10 to 20% of the time, Barnick filled out the order forms for the pediatrician.  Vaccines cannot be purchased at a pharmacy; they are prescribed by the pediatrician and then administered directly to the patient at the pediatrician's office.  (ER Tab 27, p. 3, ¶ 6).

Barnick did not detail Altace or Protonix to pediatricians; his calls to

(continued...)

How Pharmaceutical Companies Such as Wyeth
Sell and Distribute Their Products[4]

"Manufacturers of brand name prescription drugs generally do not sell directly to the retailers of their drugs, that is, to hospitals, HMO's, nursing homes, and pharmacies, but instead sell to wholesalers for resale to the retailers."  *In re Brand Name Prescription Drug Antitrust Litigation*, 186 F.3d 781, 783 (7th Cir. 1999).[5]  Wyeth apparently sells both to wholesalers as well as to some pharmacies and hospitals.  (ER Tab A, p. 8).  Prices charged to retailers vary based on an elaborate system of charge-backs to wholesalers that allows drug manufacturers to offer discounts to certain large scale retail purchasers of its prescription drugs, but not to others.  *Id.* 186 F.3d at 783-84.

_____

[3](...continued)
pediatricians were separate and distinct from the calls he made to doctors for Altace or Protonix. (ER Tab 27, p. 3, ¶ 7).  Since Barnick spent less than half his working time assisting pediatricians order doses of vaccines, his work selling vaccines does not suffice to make him an exempt outside salesperson under IWC wage orders.

[4]    Because Barnick spent less than half his working time assisting pediatricians order doses of Prevnar and FluMist, the ultimate issue in this case is whether Barnick's activities in detailing Altace or Protonix constitute "selling" under the Wage Order.  Accordingly, this and subsequent sections of this brief will solely address Altace and Protonix, and specifically will not address physician administered products such as Prevnar and FluMist.

[5]    Wyeth was a defendant in *In re Brand Name Prescription Drug Antitrust Litigation*, 186 F.3d 781, 783 (7th Cir. 1999).  In 1996, Wyeth settled the claims asserted against it in that action.  (ER Tab A, p. 20).

5

How Pharmaceutical Companies Such as Wyeth Promote Their Products

Pharmaceutical companies, including Wyeth, engage in direct to consumer advertising via television, radio and print media.  Like other pharmaceutical companies, Wyeth also employs Pharmaceutical Representatives who detail its products to physicians seeking to influence and increase the number of prescriptions written for Wyeth products. (ER Tab 29, pp. 3,20, ¶¶ 3,34; ER Tab 27, p. 2, ¶ 5).  By influencing and increasing prescriptions, Wyeth seeks to increase demand for their products amongst the physician's patients, thereby increasing the number of purchases of Wyeth products made by patients/consumers, thereby increasing demand amongst retailer sellers and thus increasing Wyeth's sales to wholesalers, pharmacies and hospitals.  The employees who detail products to physicians are known generically as "Pharmaceutical Sales Representatives" ("Pharmaceutical Reps").  (ER Tab 29, p. 3, ¶ 3).  Barnick was a Pharmaceutical Rep.  (ER Tab 27, p. 2, ¶ 2).

Wyeth has determined that the skills best suited for the one-on-one promotion of its products to physicians are, colloquially speaking,  "sales" skills. Thus, Wyeth trains its Pharmaceutical Reps in what it calls "sales" skills (ER Tab 29, pp. 7-8, ¶¶ 11-13), refers to its Pharmaceutical Reps as salespersons (ER Tab 29, p. 4,  ¶ 6), calls the Pharmaceutical Reps as a group a "sales" staff (ER Tab 29,

p. 5, ¶ 7), and utilizes "sales-speak." (ER Tab 29, pp. 14-15, 18-19,  ¶¶ 24,25,29,30,31).

Pharmaceutical Reps, however, do not engage in any transactional sale of non-physician administered products such as Altace and Protonix.  (ER Tab 27, p. 3, ¶ 8). They do not sell these Wyeth products to doctors (*Id.*), doctors do not buy these from them (*Id.*), they do not receive money or any other payments from doctors in exchange for these Wyeth products (*Id.*), doctors do not sign contracts with them for the purchase of these products (*Id.*), and doctors do not place any orders for these Wyeth products with or through them.  (*Id.*).   A Pharmaceutical Rep's primary duty with regard to these products is to attempt to influence the doctors to prescribe Wyeth prescription drug products.  (ER Tab 29, p. 3, ¶ 4).  Of course, once a doctor writes a prescription, the sale to the patient/consumer, if any, takes place between the patient and a retail pharmacy.  And, well before any such sale of a specific Wyeth product by a retail pharmacy to a patient/consumer occurs, that same Wyeth product was sold by Wyeth to an independent wholesaler or a large hospital or pharmacy chain.  Wyeth's income from manufacturing and selling these pharmaceutical products is generated exclusively by bulk sales to wholesalers and to some large hospitals and pharmacy chains.

<u>The Lawsuit</u>

Barnick filed this suit in Los Angeles County Superior Court as a class action alleging that Wyeth had violated California's mandatory overtime requirements by failing to pay her and other similarly situated Pharmaceutical Reps overtime wages for all hours in excess of 40 in a workweek and 8 in a day.  Wyeth removed the case to the Central District of California under the Class Action Fairness Act of 2005.  (CR Tab 1).

<u>The District Court's Opinion</u>

As the district court recognized, Mr. Barnick "did not as a general matter directly sell any Wyeth products to physicians."  (ER Tab 51, p. 3).  Instead of directly selling Altace and Protonix, Mr. Barnick's "essential function" was to "effect sales by educating and guiding health care professionals," and by "promoting treatment practices that [were] consistent with approved indications" (ER Tab 51, p. 2) (internal quotation marks omitted).  Mr. Barnick's "primary responsibility was to generate revenue for Wyeth by focusing on visiting specific doctors" and attempting "to persuade them to prescribe [Wyeth's] pharmaceutical products to the greatest extent possible."  (ER Tab 51, p. 2-3) (internal quotation marks omitted).  Thus, the district court recognized that Mr. Barnick and the other sales representatives he seeks to represent do not sell Altace or Protonix because

8

encouraging a doctor to write a prescription that, if written at all, may result in a

patient buying a Wyeth product from a pharmacy, is many degrees removed from

selling a product directly to a consumer.

Notwithstanding the district court's recognition of the reality on the

ground, and the court's understanding that Mr. Barnick's job duties were more

consistent with targeted promotion than sales as that distinction has been "laid

down by the Department of Labor and several federal courts" interpreting the Fair

Labor Standards Act ("FLSA") – the district court concluded that it "simply d[id]

not find this definition of sales persuasive" and "refuse[d] to apply it to

California's outside sales exemption."  (ER Tab 51, p. 15).

In refusing to apply the law and regulations concerning the outside

sales exemption under federal law, the district court emphasized that Barnick "was

very rarely subject to any direct supervision, but was required to log his calls with

physicians at the end of each working day, file weekly activity reports, check his

voice mail three times a day, and computer synchronize once per day," (ER Tab

51, p. 2) and stressed plaintiff's testimony that he "was hired as a sales staff

member by Wyeth" and that the plaintiff "referred to himself as a salesperson."

(ER Tab 51, p. 4).  In a footnote, the Court acknowledged that there was some

uncertainty how Wyeth tied the plaintiff's compensation to "sales," (ER Tab 51, p.

9

4 n.3), but noted that the plaintiff "received additional compensation tied to the number of sales of Wyeth's products he assisted in generating."  (ER Tab 51, p. 2).

The court began its legal analysis by noting its conception of the purpose of the *exemption*.  No mention is ever made of the purpose of California's wage and hour laws.  The Court quoted an opinion letter from California Division of Labor Standards Enforcement (DLSE), which stated that outside salespersons generally "set their own time, and they're on the road, they call on their customers . . . Rarely [does the employer] know what they're doing on an hour-to-basis [sic]." (ER Tab 51, p. 8) (quoting DLSE Op. Letter, Sept. 8, 1998).  "Hence, it is 'very difficult to control their hours and working conditions.'"  (ER Tab 51, p. 8).

Next, the court listed and considered the factors that a federal district judge in Michigan analyzing the applicability of the federal outside sales exemption under the FLSA had identified as probative of an employee's status as an outside salesperson:  "(1) '[T]he job was advertised as a sales position and the employee was recruited based on sales experience and abilities.' (2) 'Specialized sales training.' (3) 'Compensation based wholly or in significant part on commissions' (4) 'Independently soliciting new business' (5) '[R]eceiving little or no direct or constant supervision in carrying out daily work tasks.'"(ER Tab 51, p.

10) (quoting *Nielsen v. Devry, Inc.*, 302 F. Supp. 2d 747, 756-58 (W.D. Mich. 2003)).

Based on these factors, the district court concluded that "plaintiff clearly qualifies as an outside salesperson."  (ER Tab 51, p. 11).  The court found the frequent use of the term "sales" to be significant even though Mr. Barnick's actual job duties encouraging doctors to prescribe Altace and Protonix were not consistent with any traditional notion of an outside sales job.  The court observed that "Plaintiff was hired on the basis of his sales experience for a job referred to both by himself and his employer as a sales position.  Throughout his employment for Wyeth, Plaintiff received regular specialized sales training at sales conferences. Plaintiff was expected to and did in occasionally solicit new business for Defendant." (ER Tab 51, p. 11).  "Most significantly, Plaintiff's pay was determined at least in part on the basis of sales he generated.  Additionally, Plaintiff, despite certain restrictions placed on his activities by Wyeth, received virtually 'no direct or constant supervision in carrying out' his daily work."(ER Tab 51, p. 11-12) (quoting *Nielsen*, 302 F. Supp. 2d at 758).

For further support, the Court relied on *Neilsen*'s reference to the federal regulation that in "borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to

11

the extent of obtaining a commitment to buy from the person to whom he is

selling." (ER Tab 51, p. 12) (quoting 29 C.F.R. § 541.504(b)(2) (2003)).

Notwithstanding this critical dichotomy,[6] the court held that the plaintiff's

contention that physicians are not ultimate purchasers "a distinction without a

difference":

> Nothing in the language of the outside salesperson exemption
> requires an exempted employee to engage in direct as opposed to
> indirect sales. Though it is true physicians never actually buy
> Wyeth's prescription products, it is clearly they who control the
> product's ultimate purchase. Because physicians determine whether or
> not a patient will buy a prescription product, it is they who are
> appropriately the target for sales efforts and apporiately considered
> Wyeth's customers. Plaintiff's contrary analysis would produce the
> absurd conclusion that Wyeth does not engage in any sales activity
> regarding its prescription products merely because its efforts are
> rationally aimed at those determining the product's purchase rather
> than the directed buyers of the product.

(ER Tab 51, p. 14).

"Furthermore," the court continued, "Plaintiff's characterization of his

employment on this basis is entirely divorced from the underlying concerns

motivating the exemptions; *i.e.* the commissioned pay received by salespersons and

the individual character of their work." (ER Tab 51, p. 14).

---

[6]    *See* discussion at p. 25 and fn. 10, *infra*.

Finally, in rejecting the federally accepted "distinction between promotion and sales" the court explained that because a sales representative attempts to persuade doctors to change their behavior prospectively by prescribing Wyeth products that are later purchased by patients from pharmacies and "is compensated on the basis of his success in doing so then the employee is clearly engaged in sales activity and not mere general promotion of the product." The district court explained that this

> is particularly so when, as in the case, it has not been alleged that any other employee will affirmatively make further contact with the customer to consummate the sale. The distinction between sales and promotion is not logically made dependent on whether an employee's efforts are directed at persuading particular individuals to purchase a product rater than the general public and whether the employee is compensated based on the employee's success in securing purchases from particular individuals.

(ER Tab 51, p. 15). And with that, the court granted the defendant's motion for summary judgment. [7]

--------

[7]    Wyeth had also moved for summary judgment on the basis that Barnick was exempt under the Administrative Exemption. Because Barnick did not work "at the level of *policy* or *general* business operations," but instead merely carried out the day-to-day operations of Wyeth, Barnick could not meet the "directly related to managerial policies or general business operations" prong of the Administrative Exemption. Thus, summary dismissal could not have been properly granted on this issue, particularly in light of a recent California Appeals Court decision nearly directly on point. *Harris v. Superior Court*, 2007 WL

(continued...)

13

<u>Standard of Review</u>

This Court must review the district court's order granting Wyeth's

motion for summary judgment *de novo*. *Dominguez-Curry v. Nevada Transp.*

*Dep't*, 424 F.3d 1027, 1033 (9th Cir. 2005). Here, *de novo* review requires that all

facts contained in the limited record allowed by the district court are examined, and

inferences drawn, in the light most favorable to Plaintiff. *Id.*

<u>Summary of the Argument</u>

In granting judgment summarily in favor of defendant Wyeth, the

district court committed two fundamental errors.

First, the court ignored the bedrock principle that the California Labor

Code, like the FLSA that it sought to expand upon, is a remedial statute that must

be "liberally construed" in order "to promote the general object sought to be

accomplished." *California Grape & Tree Fruit League v. Industrial Welfare*

*Commission*, 268 Cal. App. 2d 692, 698 (1969); *see also McIntosh v. Aubry*

*(Pricor, Inc.),* 14 Cal. App. 4th 1576, 1589 (1993). The object of the Code is to

_____

[7](...continued)
2325580 at *7 (2007). Since the district court's ruling in this case, the California
Supreme Court has granted review in *Harris*. Given that California law on this
issue is presently in flux and will shortly be addressed by the California Supreme
Court, any decision based on this issue at this point in time would be inappropriate
without the opportunity for further discovery and briefing based on the California
Supreme Court's forthcoming decision.

protect employees from unscrupulous employment practices such as refusing to pay a premium for overtime work. Accordingly, exemptions allowing employers to ignore the core protections of the Code "are narrowly construed against the employer and their application is limited to those employees *plainly and unmistakably* within their terms." *Nordquist v. McGraw Hill Broadcasting Co.*, 32 Cal. App. 4th 555, 562 (1995) (emphasis supplied); *see also Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 794 (1999) ("under California law, exemptions from statutory mandatory overtime provisions are narrowly construed").

Second, in its zeal to give life to what it perceived to be the policy rationales animating the outside sales *exemption* rather than the *Code* (*i.e,* the *exception* instead of the *rule*), the district court interpreted and applied the exemption in a manner that collides squarely with settled California law. The district judge did this by dismissing as "unpersuasive" federal law narrowly construing and interpreting the outside sales exemption under the FLSA and refused to "apply it to California's outside sales exemption." (ER Tab 51, p. 15). It is well-settled, however, that California wage and hour laws are more employee-protective than the FLSA in general and specifically when interpreting the outside sales exemption. *See Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785 (1999); *see also Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314, 323-24 (2005) ("A review

15

of our labor statutes reveals a clear legislative intent to protect the minimum wage

rights of California employees to a greater extent than federally"). Moreover, even

if reality could be defied and California law could somehow be understood as

providing *less* protection to employees than the FLSA, such an interpretation

would conflict with federal law and the California Legislature's express intent to

provide increased protections to employees when the Code was enacted. *Id.*

        The district court's judgment should be summarily reversed. Instead

of construing the plain language of the outside sales exemption to California's

mandatory overtime laws grudgingly, as is unquestionably required given the law's

overriding remedial purpose, the district judge did exactly the opposite. Indeed,

the opinion interprets the outside "sales" exemption so liberally that it nearly

swallows the presumptive rule commanding overtime protection. According to the

district court's reasoning, as long as an employee's job activities are generally

directed toward the ultimate goal of increasing sales of a product or service,

however attenuated or removed it may be from consummating an actual sale, that

employee is denied the protection of California's overtime law. There is little to

limit the logical reach of the outside sales exemption so construed. Even the

employer's own self-serving use of sales terminology to describe a job or job

functions – irrespective of reality – is apparently enough to warrant application of

16

the outside sales exemption.  Indeed, it appears that every employee who works outside the office and promotes, advertises or markets a product or service, is brought within the expansive scope of this exemption as interpreted by the district court.

The district court's judgment should be vacated and the case should be remanded so that Plaintiff, and those he seeks to represent, can receive appropriate compensation for their overtime hours.

<u>Argument and Authorities</u>

This appeal concerns whether an employee who does not spend more than half of his working time directly selling any product or service to any person or entity, but instead engages in one-on-one promotion of his employer's products incidental to sales made by others, engages in "selling" within the meaning of the outside salesperson exemption to California's mandatory overtime requirements.

California's overtime compensation laws are liberally construed.  Any exemption from the remedial mandate is strictly interpreted against the employer asserting it.  An exemption may be applied only to those employees who fall *plainly and unmistakably* within its express terms.  It is not for the courts to divine and promote their own perception of an exemption's purpose, but to strictly apply the language of the exemption as written.

Notwithstanding these bedrock principles, the district court ruled that Plaintiff William Barnick – who spent more than half of his working time merely encouraging doctors to prescribe Altace and Protonix to patients who would then purchase the products from a pharmacy – fell within the scope of California's exemption for employees who actually sell products to customers.  Turning the Code on its head, the district court interpreted the *exemption* broadly granting

18

Wyeth relief from the burden and inconvenience of paying increased wages for overtime work.[8]

California's Overtime Pay Mandate

California Labor Code section 510 *requires* employers to compensate non-exempt employees for the time worked in excess of the statutorily defined maximum hours.  Cal. Lab. Code § 510.

The California Labor Code, like the FLSA upon which it sought to expand, is a remedial statute that must be "liberally construed" in order "to promote the general object sought to be accomplished."  *California Grape & Tree Fruit League v. Industrial Welfare Commission*, 268 Cal. App. 2d 692, 698 (1969); *see also McIntosh v. Aubry (Pricor, Inc.),* 14 Cal. App. 4th 1576, 1589 (1993).

---

[8]    The court of appeals in *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 413 (5th Cir. 1975) described a similar error: "The trial court, without discussing any of the regulations which the statute expressly make part of the law, seemed impressed with the value of the exemption to a company that employs drivers to deliver its products on an established given route.  In arriving at its findings of fact, the trial court overlooked completely the basic fact that [Plaintiff's] testimony was undisputed to the extent that he did no selling, in the sense that he had no face-to-face negotiation with a store owner or manager who was in the position of purchasing or ordering the products which Skipper was delivering."

<u>The California Labor Code Outside Sales Exemption</u>

Since the purpose of the Labor Code is to secure for California's citizens fair working conditions and wages, including fair compensation for overtime work, *id.,* a court interpreting *exemptions* to the Labor Code's core command must do so sparingly.

The very nature of an exemption undermines the purpose of the overtime laws in the first instance. As such, an exemption must never be expanded to anyone "other than those *plainly and unmistakably* within its terms." *Nordquist v. McGraw Hill Broadcasting Co.*, 32 Cal. App. 4th 555, 562 (1995) (exemptions "are narrowly construed against the employer and their application is limited to those employees *plainly and unmistakably* within their terms") (emphasis supplied); *see also Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 794 (1999) ("under California law, exemptions from statutory mandatory overtime provisions are narrowly construed").

Labor Code section 1171 exempts "any individual employed as an outside salesman . . ." Cal. Lab. Code §1171. California's Industrial Welfare Commission ("IWC") defines the term "outside salesperson" as "any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business **selling tangible or**

20

**intangible items or obtaining orders or contracts for products**, services or use

of facilities."  Cal. Code Regs. tit. 8 §11010 2(J) ("Wage Order 1-2001")

(Emphasis added).

      When a statute or regulation does not specifically define a term, as the

IWC's Wage Order does not specifically define "selling," such terms must be

interpreted in accordance with their ordinary and common meaning.  *Alvarez v.*

*IBP, Inc*., 339 F.3d 894, 904 (9th Cir. 2003) (citation omitted).[9]

      The ordinary, common meaning of the term "selling" is limited to the

transactional model of a sale in which property is exchanged for consideration.  *See*

*Paykar Constr., Inc. v. Bedrosian*, 71 Cal. App. 4th 803, at 807 (2nd Dist. 1999)

(the ordinary, common meaning of the term "sale" is "'[a] contract between two

parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or the

---

[9]    *See also Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) ("To determine the meaning of a term in a [FLSA] regulation [governing an overtime exemption], [the court] look[s] to the common meaning of the word") (citation omitted); *Gattuso v. Harte-Hanks Shoppers, Inc*., __ Cal. Rptr. 3d __, 2007 WL 3243861, at *7 (Cal. Nov. 5, 2007) ("Generally, the court first examines the statute's words, giving them their ordinary and usual meaning and viewing them in their statutory context, because the statutory language is usually the most reliable indicator of legislative intent.") (citation omitted); *Paykar Constr., Inc. v. Bedrosian*, 71 Cal. App. 4th 803, 806-07 (2d Dist. 1999) (same).  "When a statute does not define a term, a court should construe that term in accordance with its 'ordinary, contemporary, common meaning.'"  *Cleveland*, 420 F.3d at 989 (citation omitted).

21

purchaser), by which the former, in consideration of the payment of promise of payment for a certain price in money, transfers to the latter the title and possession of property.'") (quoting *Black's Law Dictionary* (6th ed. 1990)); *Special Devices, Inc. v. OEA, Inc*., 117 F.Supp.2d 989, 994 (C.D. Cal. 2000) ("A sale is 'a contract between parties to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'") (citations omitted).

The Wage Order's terms "obtaining orders or contracts" are subject to similar interpretation. The ordinary meaning of "obtain" is to gain or attain possession of something. *The Regents of the Univ. of California v. Hansen*, No. Civ. S98-0715, 1999 WL 33268423, at *7 (E.D. Cal. Nov. 8, 1999) ("The dictionary definition of "obtain" is "to gain or attain possession or disposal of, usually by some planned action or method.") (quoting *Webster's 3rd New World International Dictionary*, unabridged edition, G + C Merriam & Co (1976)); *United States v. Stout*, 1990 WL 121349 (E.D. Pa. Aug. 17, 1990) ("The ordinary meaning of 'obtained' connotes some act of acquisition, or procurement, i.e., the gaining of possession.") (quoting *Webster's Unabridged New International Dictionary* 1682 (2d ed., 1961); *Black's Law Dictionary* 972 (5th ed., 1979)).

The common definition of the term "orders" is "[a] written direction to pay money or deliver property, made by a person legally entitled to do so," *Oxford English Dict.* (2d ed. CD-ROM 2005), while the common meaning of "contract[]" is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," *Black's Law Dictionary* (7th ed. 1999). Thus, according to the common meaning of the terms by which the IWC has defined "outside salesperson,", to qualify for the outside sales exemption under California law, the employee must (1) work outside the employer's place of business, (2) working on actually consummating their own sales, (3) more than fifty percent of the time. The only question here is whether Plaintiff's work encouraging doctors to prescribe Altace and Protonix involved him in actually consummating his own sales. The answer is simple. It did not.

Mr. Barnick was not primarily engaged in "selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." He did not engage in any sales transactions for Altace or Protonix with any of the physicians on whom he called. He obtained no payment, no promise of payment, indeed no consideration at all from the physicians on whom he called when he was urging them to prescribe Altace and Protonix, and he transferred title to no tangible or intangible items to those physicians.

23

Nor did Mr. Barnick obtain any orders or make any contracts for Altace or Protonix.  No orders for Altace or Protonix were placed with or through Mr. Barnick, thus he "obtained" none, and he executed no contracts for Altace or Protonix with the physicians on whom he called.  While no one disputes that Mr. Barnick provided physicians with information and attempted to persuade them of the benefits of Altace and Protonix for the physician's patients in order to induce physicians to write more prescriptions, which might ultimately result in the sale of those Wyeth products by some unknown retail pharmacy, Mr. Barnick himself engaged in no such sales.  Accordingly, because he did not actually consummate sales of Altace or Protonix, he cannot "plainly and unmistakably" fall within the terms of California's outside sales exemption

<u>The FLSA's Narrow Construction of the Outside Sales Exemption</u>

Even though Mr. Barnick's claims are brought under California's state wage and hour laws, and not under the FLSA, an examination of the application of federal overtime laws and the outside sales exemption to employees like Pharmaceutical Reps is instructive here.  Ultimately, the distinctions between the FLSA and the Code make it plain that the targeted product promotion work performed by Pharmaceutical Reps such as Mr. Barnick cannot be characterized as selling under California law (or the FLSA).  An analysis of the outside sales

24

exemption under the FLSA also establishes that the district court interpreted the California outside sales exemption to be broader, and thus less protective of employees, than the corresponding FLSA exemption.  Because such an interpretation violates California law, this too demonstrates the court's error.

As the district court appears to have recognized, Pharmaceutical Reps do not plainly and unmistakably fall within the scope of the outside sales exemption under the FLSA. (ER Tab 51, p. 15) ("this is likely a correct application of the distinction between promotion and sales laid down by the Department of Labor and several federal courts with regard to the FLSA . . . .").  The implementing regulations of the FLSA make clear that promotional activity incidental to sales made by others, rather than one's own individual sales, is not outside sales work.  *See* 29 C.F.R. §541.504(a) (2001); 29 C.F.R. §541.503 (2005).[10]

---

[10]    Contrary to the district court's efforts to marginalize the requirement that one must be engaged in activities directed toward the consummation of his own sales as limited to "borderline cases" (ER Tab 51, p. 13) and a "second mode of analysis" (ER Tab 51, p. 13), this requirement is one of the very core concepts underlying the FLSA's outside salesperson exemption.  It is a concept contained in virtually every section and subsection of the outside sales regulations.  *See* §541.500(b); §541.503; §541.504(a); §541.504(b)(2); §541.504(c)(2); §541.504(c)(3); §541.504(c)(4); §541.505(a); §541.505(c); §541.505(d); §541.506.

Under the FLSA's definition of the "outside sales" exemption in effect at the time that §1171 was enacted and the Wage Orders were adopted,[11] an employee's hours of work of a nature other than sales could not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer.

---

[11]    The federal regulations as they existed in 2001 are the regulations most relevant to California's wage and hour laws.  When the Wage Orders have specifically referred to federal regulations, they have referred to those in place in 2001, *see, e.g.,* Wage Order 1-2001, ¶ 1.(A)(1)(e),  evidencing an intent by the IWC to interpret Wage Orders with regard to the federal regulations in place at the time the Wage Order is enacted.

Nevertheless, even if the post-2004 federal regulations are relevant, the result is identical.  *See*, 29 C.F.R. § 541.503(b) (2007) ("Promotional activities [by manufacturers' representatives] designed to stimulate sales that will be made by someone else are not exempt outside sales work.").  The Preamble to the new regulations makes clear that no change in this particular area was intended:

> [T]he Department does not intend to change any of the essential elements required for the outside sales exemption, including the requirement that the outside sales employee's primary duty must be to make sales or to obtain orders or contracts for services. An employer cannot meet this requirement unless it demonstrates objectively that the employee, in some sense, has made sales. . . .*Extending the outside sales exemption to include all promotion work, whether or not connected to an employee's own sales, would contradict this primary duty test.*

*Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22121, 22162-63 (April 23, 2004) (emphasis added).

29 C.F.R. § 541.500.  However, in computing this percentage, any non-sales work performed incidental to one's own sales activities was considered sales work for purposes of the computation.  *Id.*

Promotion is specifically identified in the DOL outside sales regulations as non-exempt, non-sales work.  Promotion work does not "constitute[] making sales within the meaning of [the outside sales exemption]."  29 C.F.R. §541.505(d).  "Nonexempt work is that work which is not sales work . . . ."  29 C.F.R. § 541.506.  Thus, when the regulations refer to promotion work as being non-exempt work, that means it is not sales work.  Promotion work, like other non-sales work such as delivery, can constitute sales work under the federal regulations only if it is conducted incidental to one's own sales.

The DOL regulations contain numerous examples of employees engaged in product promotion work with regard to sales to be made by others not being within the scope of the outside sales exemption.  Pharmaceutical Reps are manufacturer representatives, which are specifically covered in sections 504(b) and 504(c) of the regulations.  In §541.504(b)(2), the DOL states that manufacturer representatives "can be considered salesmen only if they are actually employed for the purpose of and are engaged in making sales or contracts. To the extent that they are engaged in promotional activities designed to stimulate sales which will be

made by someone else the work must be considered nonexempt."  Likewise, in

§541.504(c)(2), the DOL addressed manufacturer representatives whose job it is to

convince retailers to buy from wholesalers ("jobbers" who in turn buy from the

manufacturers): "The order in this instance is taken by the jobber's salesman after

the manufacturer's representative has done the preliminary work which may

include . . . talking to the retailer for the purpose of getting him to place the order

for the product with the jobber's salesman. In this instance the sale is consummated

by the jobber's salesman. The work performed by the manufacturer's representative

is not incidental to sales made by himself and is not exempt work."

In §541.504(c)(3), the DOL addressed various scenarios involving

another type of manufacturer's representative – the utility company representative:

> Another type of situation involves representatives
> employed by utility companies engaged in furnishing gas
> or electricity to consumers. In a sense these
> representatives are employed for the purpose of ``selling"
> the consumer an increased volume of the product of the
> utility. This ``selling" is accomplished indirectly by
> persuading the consumer to purchase appliances which
> will result in a greater use of gas or electricity. Different
> methods are used by various companies. In some
> instances the utility representative after persuading the
> consumer to install a particular appliance may actually
> take the order for the appliance which is delivered from
> stock by his employer, or he may forward the order to an
> appliance dealer who then delivers it. In such cases the
> sales activity would be exempt, since it is directed at the
> consummation of a specific sale by the utility

28

representative, the employer actually making the delivery in the one case, while in the other the sale is consummated in the sense that the representative obtains an order or commitment from the customer. *In another type of situation the utility representative persuades the consumer to buy the appliance and he may even accompany the consumer to an appliance store where the retailer shows the appliance and takes the order. In such instances the utility representative is not an outside salesman since he does not consummate the sale or direct his efforts toward making the sale himself. Similarly, the utility representative is not exempt as an outside salesman if he merely persuades the consumer to purchase an appliance and the consumer then goes to an appliance dealer and places his order.*

(Emphasis added). The examples contained in §504(c)(3) make clear both that product promotion work done incidental to sales to be consummated by others is not sales work and that, to be considered a sale within the outside sales exemption, an order must be placed with or through the employee. If an order is not placed with or through the employer's representative, that employee is not engaged in sales within the meaning of the outside sales exemption.

The product promotion/sales distinction is further clarified in the DOL's Field Operations Handbook:

22e04   Soliciting business through a dealer. *An employee whose duty is to convince a dealer of the value of his employer's service to the dealer's customers and who does not in fact obtain firm orders or contracts from either the dealer or his customers is not making sales within the meaning of FLSA Sec. 3(k).* An example is

29

> merchant's contact men employed by finance companies
> who call at the place of business of retail merchants
> dealing in furniture or appliances and bring to the
> merchant's attention the finance service that the finance
> company is prepared to offer to any of the merchant's
> customers who are in need of money for purchases, and
> who lay the groundwork for a continuing relationship
> between the finance company and the merchant.  The
> finance man deals with the merchant and the merchant
> with his customers.  The finance man is not exempt under
> Reg 541.5, since he does not obtain orders or contracts
> from either the customers or the merchant.

*DOL Field Operations Handbook*, 7/28/65, ¶22e04, at WH66-89 (emphasis

added).  Just as finance companies' contact men "bring to the merchant's attention

the finance service that the finance company is prepared to offer to any of the

merchant's customers," the Pharmaceutical Reps merely bring to the physician's

attention the characteristics and qualities of their company's drugs.  Just as "[t]he

finance man deals with the merchant and the merchant with his customers," the

Pharmaceutical Reps deal with the physician and the physician with his patients.

The contact men and the Pharmaceutical Reps are involved in sales to be made by

others, but because they do not actually make the sales, they are not "outside

salespeople."

> Indeed, there is little to distinguish the goal of the work performed by

a Pharmaceutical Rep from the television and print advertisements for prescription

drugs that are so ubiquitous.  The purpose of pharmaceutical advertisements is

unmistakably clear – to encourage consumers to ask their doctors to write them a prescription and, secondarily, to encourage doctors themselves to write prescriptions.  Through advertisements, the manufacturers of the drugs hope to increase demand for their products and thereby increase sales of their products at retail pharmacies, which then allows pharmaceutical companies to manufacture more of the drug which they will sell to wholesalers who will in turn sell to retail pharmacies, which is in actuality how prescription drugs are sold and distributed.[12] Yet, no one can credibly argue that employees who design and produce advertising pieces are involved in a narrow construction of "selling" – a transactional sale. They are rather involved in promotion, marketing or advertising, which while intended to impact sales, is not itself "selling."

The activities of Pharmaceutical Reps are much more akin to the "advertising/marketing" model than they are to any "sales" model.  Pharmaceutical Reps, like advertisers and marketers, promote products in order to impact sales to be made by others, but they themselves do not make sales.

---

[12]     *See In re Brand Name Prescription Drug Antitrust Litigation*, 186 F.3d 781 (7th Cir. 1999) (discussing in some detail how pharmaceutical companies sell prescription drugs to wholesalers, who in turn sell the drugs to hospitals, nursing homes, HMO's and pharmacies, and the salespersons [not Pharmaceutical Reps] who negotiate pricing directly with retailers which will then result in charge-backs to the wholesaler to compensate for the discounted price negotiated with the retailer).

As demonstrated above, Pharmaceutical Reps are entitled to the protections afforded by the FLSA. They do not fall within any reasoned interpretation of the outside sales exemption under the FLSA. Curiously, the district court recognized as much. In response to Plaintiff's argument that "he was engaged in product promotion rather than sales," the district judge acknowledged Plaintiff's position was "likely a correct application of the distinction between promotion and sales" as "laid down by the Department of Labor and several federal courts." (ER Tab 51, p. 15). Nevertheless, the district court refused to apply the distinction it found in federal law and instead struck out on its own explaining that the "distinction between sales and promotion is more logically made dependent on whether an employee's efforts are directed at persuading particular individuals to purchase a product rather than the general public and whether an employee is compensated based on the employee's success in securing purchases from particular individuals." (ER Tab 51, p. 15).

The only support the district judge musters for his rejection of the U.S. Department of Labor's treatment of the law is that he believes his interpretation "seems to better comport both with a common understanding of sales work and, more importantly, *with the policies behind the outside sales exemption*." *Id.* (emphasis supplied). Beyond the obvious questions raised by the first segment

of this language – such as whose "common" understanding of sales work includes no sale, no order, no contract and/or no transfer of title – the district judge's call to promote the policy behind the exemption over the plain language of the exemption should be rejected.

The district court went a step further.  Instead of just disagreeing with federal law (which is not directly at issue insofar as Plaintiff does not assert any claims under the FLSA), the district judge held that his "common understanding" approach, designed to advance the policy rational for the outside sales exemption, *is the law of the State of California*.  No California court has ever held anything of the sort.

The California Supreme Court's Narrower Construction
of the Outside Sales Exemption

California's wage and hour laws are frequently more employee-protective than the FLSA.  *See Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323-24 (2005).  Indeed, the scope of protection afforded by California's overtime laws for workers who might arguably be exempt as outside salespersons under California law was held to be more protective of employees by the California Supreme Court in *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785. *Ramirez* involved a route driver for Yosemite Water Co. who engaged in both exempt (sales) activities and non-exempt (delivery) activities.  *Ramirez* is

33

instructive insofar as it confirms that the type and nature of activities that qualify as "sales" under California's outside sales exemption are severely circumscribed – even more so than under the FLSA.

The Court of Appeals decision under review in *Ramirez* had utilized the federal regulations to determine that the delivery duties of the route driver were incidental to his own sales and thus, when combined resulted in exempt sales activities at greater than the 50% required under the California statute.

The California Supreme Court reversed in *Ramirez*, explaining that state law differed from federal law "in that it does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is *incidental to* sales. The language of the state exemption only encompasses work directly involved in 'selling ... items or obtaining orders or contracts.'" 20 Cal. 4th at 797.  Thus, the California Supreme Court specifically held that non-exempt, non-sales work could not under any circumstances be counted as exempt sales work under the California outside sales exemption because the California version of the outside sales exemption does not allow non-exempt work *incidental* to sales to be converted to sales work.  Accordingly, promotion work, which can be converted to exempt sales work under the federal scheme only by being conducted

34

*incidental to* one's own sales work, cannot constitute "selling" under the California outside sales exemption.

The importance of *Ramirez* cannot be overstated.  Notwithstanding *Ramirez's* clear command, the district court held that "[n]othing in the language of the outside sales exemption requires an exempted employee to engage in direct as opposed to indirect sales."  (ER Tab 51, p. 14).  While that may be true in the literal sense that the exemption does not expressly so state,[13] the district court's holding that work designed to influence the sales of another is exempt under California law *conflicts directly* with the California Supreme Court's ruling in *Ramirez* that the California outside sales exemption "only encompasses work directly involved in 'selling ... items or obtaining orders or contracts.'" 20 Cal. 4th at 797.  Needless to say, there is little to recommend the district court's unique method of interpreting California law.

_____

[13]      Whether or not the language of the outside salesperson exemption specifically requires an exempted employee to engage in direct as opposed to indirect sales is entirely the wrong analysis – indeed it is exactly backwards.  Because exemptions must be narrowly construed, the question is not whether the language of the exemption excludes it, but rather whether it clearly *includes* it.  There are certainly many things that the outside sales exemption does not expressly exclude; however, because exemptions must be narrowly construed and may only be applied to employees who clearly and unmistakably fit within their express terms, the exemption may be applied only if the interpretation being considered is clearly included within the language of the exemption.

The District Court Improperly Adopted a Definition
of "Selling"  Under the California Wage Order that is
<u>Less Protective of Employees than the FLSA</u>

In refusing to apply the "distinction between promotion and sales" so deeply rooted in the scope of the FLSA's outside salesperson exemption to California's outside salesperson exemption (ER Tab 51, p. 15), the district court created the untenable anomaly of the California overtime laws being less protective of a group of employees than the FLSA. Under the district court's "unique" interpretation of the outside sales exemption under California law, employees performing promotion work incidental to sales to be made by others are within the scope of the California exemption (thus *not* protected by California's overtime laws) whereas the same employees are not within the scope of the FLSA exemption (and thereby protected by the overtime laws).  If upheld, this would be the first time in the history of the California overtime laws that any California exemption has been held to be broader than the corresponding federal exemption (past lower court rulings that have done so have all been overruled on appeal).

In *Ramirez,* the California Supreme Court held that the IWC, in defining the California outside sales exemption had intended to provide greater protection for California employees than under the federal exemption and that the

Court of Appeals had erred in reaching a result under which California employees were afforded less, not more, protection than under the federal standard. *Id.*

Moreover, a ruling that results in California law being less protective than federal law makes no sense. It means that the California outside sales exemption would be absorbed by federal law. "When state laws differ from the federal FLSA, an employer must comply with the standard most protective to employees." DOL Fact Sheet #17F: *Exemption for Outside Sales Employees Under the Fair Labor Standards Act (FLSA). See also* 29 U.S.C. §218 (stating that no provision of the Act "shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wages established under this Act.").

Finally, a finding that California law is less protective of employees than the FLSA is inconsistent with the intent of the Legislature in adopting § 1171. The federal outside sales exemption existed at the time the California legislature adopted its outside sales exemption, as did the interpretive regs regarding the distinction between promotion and sales. Yet, the Legislature did not insert any provision expanding the definition of sales in § 1171 and in the intervening years the IWC has similarly not in any Wage Order adopted a definition of sales broader than that contained in the FLSA or otherwise adopted any provision disavowing in

37

any manner the federal distinction between promotion and sales.  Moreover, it is

highly unlikely that, in adopting the California outside sales exemption, the

California legislature intended to adopt a provision less protective of employees

than its federal counterpart which could lead to the California exemption being

swallowed by federal law.

The District Court's Improper Elevation
of Policy Over the Terms of the Exemption

The district court places heavy reliance on the policy rationale behind the

outside sales exemption as expressed by the Tenth Circuit in *Jewel Tea Co. V.*

*Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941) and the DLSE in a September 8,

1998 opinion letter.  Indeed, the district court improperly elevates what it perceives

as the underlying policy behind the exemption over the specific requirements of the

terms of the exemption.

Neither *Jewell Tea* nor the DLSE's opinion letter can be read to suggest that

anyone who 1) works away from his employer's place of business, 2) is not subject

to the personal supervision of his employer, 3) whose employer has no way of

knowing the exact number of hours he works per day, and 4) who receives some

type of commission-like extra compensation based on the success of the employer,

is an outside salesman.  Such a reading would draw within the exemption's scope

every promotion, marketing, delivery and repair person working away from their

38

employer's place of business.  The individual passing out flyers on the street could now be exempt under the outside sales exemption under this "fits within the policy test." – as would the Sears repair man who shows up to fix your appliances, plumbers, the guys who shows up to install your cable, satellite dish, and phone system, the guy who delivers your laundry from the cleaners, and the guy who delivers your groceries from the local store.

What a blind application of this "policy" ignores is the predicate issue that must first be addressed.  Does this employee "sell" to begin with?  That issue was not at issue in *Jewell Tea*.  There was no question but that the employees in that case sold Jewell Tea products.  The question was whether their delivery function overrode their sales function.  Neither was that issue present in the situation being addressed by the DLSE opinion letter.  There was no question but that the real estate salesperson in that situation was selling homes.  The question was whether they were an inside or outside salesperson.

Thus, while it is unclear what, if any relevance the policies relied on by the district court have to the issue of whether the employee was engaged in selling in the first instance, one thing *is* perfectly clear – no spirit or policy can override the requirements of the language of the exemption.

39

While *Ramirez* did not involve the issue of whether the plaintiff in that case was involved in "sales" in the first instance, it *did* involve the issue of whether the plaintiff was involved in sales more than 50% of his working day. There can be no doubt but that the Plaintiff in *Ramirez* fit within the "policies behind the outside sales exemption" (ER Tab 51, p. 15)**,** which the district court here considered to be well nigh dispositive. Nonetheless, the California Supreme Court made perfectly clear that, unless the Plaintiff fit within the express requirements of the language of the exemption itself – in that case, selling more than 50% of his working day – he could not be held to be subject to the exemption.

This point was specifically driven home by the California Supreme Court in *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575 (Cal. 2000). At issue in *Morillion* was whether the plaintiff's compulsory travel time on company busses was "hours worked" within the meaning of Wage Order 14-80. The Defendant in that case, like District Court here, attempted to argue that policy considerations weighed against making the plaintiffs' travel time compensable. The California Supreme Court rejected this argument, specifically finding that policy rationale "do not override the plain language of Wage Order 14-80, which supports plaintiffs' claim that their compulsory travel time is compensable as 'hours worked.'" 22 Cal. 4th at 594. Similarly, the policy considerations identified by the district court

simply cannot override the plain language of the Wage Orders' definition of the

outside sales exemption, requiring that, in order to be subject to that exemption, the

plaintiff must be "selling" Wyeth's products – not promoting Wyeth's products to

be sold by unknown retail pharmacies.

<u>The District Court's Flawed Analysis of <i>Nielsen</i> and The Sales Exemption</u>

        The district court also placed great emphasis on what it characterized

as the five "indicia relied on by federal courts to support a determination that an

employee should be categorized as an outside sales person."  (ER Tab 51, p. 10)**.**

The indicia are (1) job advertised as sales and recruitment based on sales

experience and ability, (2) specialized sales training, (3) compensation based

wholly or in significant part on commissions, (4) the independent solicitation of

new business, and (5) little or not direct or constant supervision.  (ER Tab 51, p.

10) (citing *Nielsen v. Devry*, 302 F. Supp. 2d 747, 756-58 (W.D. Mich. 2003)).

        Before reaching the flaws in the actual analysis of the indicia, it is

important to recognize that the court's premise in utilizing the indicia is wrong.

The *Nielsen* factors are derived directly from the federal regulations.  *See* 29 C.F.R.

§ 541.505(e).[14]  They were first utilized by the court in *Hodgson v. Klages Coal &*

---

       [14]  [I]n borderline cases a determination of whether the driver is actually
employed for the purpose of, is customarily and regularly engaged in, and has as

(continued...)

*Ice Co.*, 435 F.2d 377, 382-84 (6th Cir. 1970) as they were expressly intended to be

used; as factors helpful in "borderline" driver/route salesmen cases to determine

whether sales is the employee's primary function.  Thus, these "indicia" were

never intended to be utilized, as the district court attempts to utilize them – to

determine whether an employee was engaged in "sales" in the first instance – but

rather were intended to be utilized to determine whether the sales activities of a

route salesman were his primary function (as opposed to his delivery activities

being his primary function).

Moreover, as the italicized portion of § 541.505(e) in footnote 14 makes

clear, these "indicia" are irrelevant if the employee is non-exempt under the plain

---

[14](...continued)
his chief duty and primary function the making of sales, may involve consideration
of such factors as [1]a comparison of his duties with those of other employees
engaged as (1) truckdrivers and (2) salesmen; [2]possession of a salesman's or
solicitor's license when such license is required by law or ordinances; [3]presence
or absence of customary or contractual rearrangements concerning amounts of
products to be delivered; [4]description of the employee's occupation in union
contracts; [5] the employer's specifications as to qualifications for hiring; [6] sales
training; [7]attendance at sales conferences; [8] method of payment; [9]proportion
of earnings directly attributable to sales effort; and [10]other factors that may have
a bearing on the relationship to sales of the employee's work.  *However, where it is
clear that an employee performs nonexempt work in excess of the amount
permitted by Sec. 541.5, he would be nonexempt in any event and consideration of
such factors as the foregoing would not be pertinent.*  29 C.F.R. § 541.505(e)
(emphasis supplied).

42

language of the exemption.  Thus, such "indicia" are not pertinent if an employee, such as Mr. Barnick, is not engaged in selling Altace and Protinix in the first instance.  The district court has completely distorted the purpose and significance of these "indicia" by elevating them to primary importance in the determination of whether an employee is engaged in sales in the first instance, which is the relevant issue the district court faced with regard to the outside sales exemption in this case.

Most importantly, however, in *Ramirez*, the *Nielsen* indicia (or more accurately, the criteria set forth in 29 C.F.R. § 541.505(e)), were expressly recognized as relating to the "primary function" element of the federal outside sales exemption and disapproved of in analyzing the outside sales exemption under California law.  *Ramirez*, 20 Cal. 4th at 796.

<u>Use of Sales Nomenclature</u>

Consistent with the *Nielsen* indicia one and two, the district court in this case emphasized the fact that Barnick was hired as a "sales staff member by Wyeth," "referred to himself as a salesperson," and was "trained in sales techniques" at "sales conferences" where "sales data" and "sales strategies" were discussed.  (ER Tab 51, p. 4)**.**

Promotion, marketing and advertising all impact the sales of pharmaceutical products.  Pharmaceutical Reps engage in a form of the first two of

those activities.  Merely because Plaintiff was hired and evaluated on his ability to change the prescribing behavior of medical providers which would result in increased sales by some unknown retail pharmacy does not lead to the conclusion that plaintiff was engaged in selling.  Impacting sales and consummating sales are not the same thing.  Marketing and advertising are designed to increase sales of products at the retail level, but those activities are not sales themselves.

Mr. Barnick engaged in a form of targeted marketing or personalized product promotion with regard to Altace and Protonix.  He provided information and may have even utilized sales skills to attempt to change the prescribing behavior of medical providers with respect to these Wyeth products.  He do not sell them.  He provided no such product to medical providers in exchange for consideration.  Any Altace or Protonix sales that resulted from the activities of Mr. Barnick were made not by him or even by Wyeth, but by retail pharmacies, just as the sales that result from any other marketing or advertising activities by Wyeth result in sales by retail pharmacies.

The district court's numerous references to the use of sales nomenclature is nothing more than window-dressing.  Under both California and federal law, titles and labels are irrelevant to the issue of whether an employee is exempt.  *See Perine v. ABF Freight Systems, Inc.*, 457 F.Supp.2d 1004, 1012

44

(2006) (job titles are unimportant in determining whether employee is exempt or

nonexempt from overtime provisions of IWC wage order); 29 C.F.R. § 541.2 ("A

job title alone is insufficient to establish the exempt status of an employee.  The

exempt or nonexempt status of any particular employee must be determined on the

bases of whether the employee's salary and duties meet the requirements of the

regulations. . . ."); *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 337 (6th Cir.

1970) (holding that certain route men did not qualify within the "outside salesman"

exemption despite a collective bargaining agreement that designated the route men

as "salesman").

Whether an employer refers to an employee as a salesperson or even if

the employee considers himself in a "sales" job is irrelevant.  In California, the role

of the Court in determining whether an employee is exempt is to look at the

requirements of the job, focusing primarily on what the plaintiff actually does.

*Ramirez*, 20 Cal.4th at 802 ("in determining whether the employee is an outside

salesperson, [the Court should inquire] into the  realistic requirements of the job.

In so doing, the court should consider, first and foremost, how the employee

actually spends his or her time.").

That an employee receives "sales" training and uses "sales-speak"

also is not determinative of whether the employee is engaged in sales.  Just because

Pharmaceutical Reps are taught and use sales "skills" in carrying out their job

doesn't make them salespersons. Skill in "sales" is nothing more than skill in the

art of "persuasion." Trial lawyers are highly skilled in the art of persuasion.

Indeed, they perform their jobs primarily outside of their offices in a courtroom.

Many are even paid based strictly on success. Their sales skills do not make them

salespersons.

The skill set Wyeth determined to develop for its Pharmaceutical Reps

does not define what they did. They could use all of the sales skills and sales-

speak in the world, but if what they did was not sales, they are not covered by the

outside sales exemption. Exemptions apply only to those who plainly and

unmistakably fit within the strict terms of the exemption.

<u>Incentive Pay</u>

The district court's reliance on the fact that Barnick "received

additional compensation tied to the number of sales of Wyeth's products he

assisted in generating," is inaccurate both factually and logically. Barnick was not

paid commissions; he was paid a bonus or incentive compensation. Moreover,

even assuming that *Nielsen* had some relevance, the court in *Nielsen* required

compensation *based wholly or in significant part* on commissions." Here, there is

no suggestion in the record that Barnick's bonus or incentive pay eclipsed his

46

regular salary to the point that it could be fairly characterized in this manner. Moreover, under California law, "commissions" must be a percent of the price of the product or service. *Keyes Motors v. DLSE* (1987) 197 Cal. App. 3d 557.

Even if it could be said that Barnick was compensated based solely or significantly on commissions (he was not), that factor should not and cannot override the language of the exemption itself. Neither the definition of outside salesperson nor the definition of selling contain any requirement that the employee be paid on a commission basis. The terms of the exemption do not exclude from its coverage an outside salesperson who is paid a straight salary or by the hour. Likewise, an employee who does not sell within the meaning of the exemption cannot be brought within the coverage of the exemption simply because he is paid in whole or part on some commission-like basis.

<u>Working Without Supervision Does Not Equate to Selling</u>

The district court also relied heavily on the fact that Barnick, "despite certain restrictions placed on his activities by Wyeth, received virtually 'no direct or constant supervision in carrying out' his daily work." (ER Tab 51, p. 4)**.** Certainly, Pharmaceutical Reps such as Mr. Barnick like any employee working away from his employer's place of business – whether involved in sales or not – does not have the same level of supervision as someone working in the employer's

47

office.  However, that fact is irrelevant to the issue of whether or not any employee was making "sales" in the first instance.

It is incontrovertible that outside salesmen generally work without a great deal of supervision during their usual working day.  The converse, however, is not true.  Just because one works without a great deal of supervision during their usual working day does not mean that such person is engaged in outside sales.  And it is certainly irrelevant to the issue of whether such person is engaged in "sales" at all.

The "outside sales" exemption is denoted the "outside" sales exemption in part to distinguish it from "inside" sales.  Inside salespersons are, by definition, engaged in "sales."  Yet, inside salespersons often work under close and frequent supervision.  However, simply because they are working under close and frequent supervision, one could not reasonably argue that, due to such supervision, they are not engaging in "sales."  While close and frequent supervision might be relevant to the "outside" element of outside sales, it is wholly irrelevant to the "sales" element.  Thus, to argue, as the district court does, that because Plaintiff worked without close and frequent supervision, he is engaged in sales (outside or otherwise) is nonsensical.

<u>Not Every Company That Sells Can Claim An Exemption</u>

The district court's observation that "[b]ecause physicians determine whether or not a patient will buy a prescription product, it is they who are appropriately the target for sales efforts and appropriately considered Wyeth's customers" misses the point.

Insofar as the policy underlying a given exemption is relevant in the first instance (it is not) – no analysis of the purpose of the outside sales exemption supports the district court's view that the exemption invariably applies to the class of employees that interacts with persons targeted as most likely to influence sales of the employer's product or service. In other words, the law does not grant every employer the opportunity to strip a class of employees of their right to overtime pay simply because they influence sales more than others.

While it may well be rational for Wyeth to aim its efforts at physicians rather than consumers, the fundamental flaw in the court's analysis is that those efforts must be "sales." The court's reasoning is circular – because the efforts must be sales, they are sales. The real analysis, which the district court avoids altogether, is whether these efforts are sales or targeted promotion and whether the sales are consummated by Pharmaceutical Reps or retail pharmacies. Moreover, the district court completely ignores that the true purchasers, at least directly from

49

Wyeth, the Pharmaceutical Reps' employer, are the wholesalers (and to some extent hospitals and pharmacies themselves).

Conclusion

Mr. Barnick does not fall plainly and unmistakably within the plain meaning of the terms of California's outside sales exemption.  The district court's order and judgment should be vacated and the case remanded.

Respectfully submitted,

OF COUNSEL:

GILLESPIE, ROZEN, WATSKY & JONES
3402 Oak Grove Ave.
Suite 200
Dallas, Texas 75204
(214) 720-2009

/s/ James  A. Jones
James A. Jones
jaj@grwlawfirm.com
3402 Oak Grove Ave.
Suite 200
Dallas, Texas 75204
(214) 720-2009
(214) 720-2291 (fax)

Attorney for Plaintiff/Appellant

50

<u>Statement of Related Cases</u>

Plaintiff-Appellant identifies the following case pending before this Court as related due to the fact that it raises the same or closely related issues:

D'Este v. Bayer
United States Court of Appeals for the Ninth Circuit
Docket No. 07-56577

/s/ James  A. Jones
James A. Jones

51

## **Certificate of Service**

I certify that two true and correct copies of this document were served upon counsel of record by Federal Express delivery (2nd Day Air), on the 14th day of January 2008, addressed as follows:

Rebecca D. Eisen
MORGAN, LEWIS & BOCKIUS, LLP
Spear Street Tower
One Market St.
San Francisco, CA 94105

Jason S. Mills
MORGAN, LEWIS & BOCKIUS, LLP
22nd Floor
300 South Grand Avenue
Los Angeles, CA 90071-3131

Michael L. Banks
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921


 /s/ James  A. Jones
James A. Jones

52

<u>Certificate of Compliance</u>

Pursuant to Fed. R. App. Pro. 32(a)(7)(c) and 9th Cir. R. 32-1, the undersigned certifies that the attached opening brief complies with the type-volume limitations of 9th Cir. R. 28-4.

1.    Exclusive of the exempted portions in Fed. R. App. Pro. 32(a)(7)(B)(3), the brief contains 11,710 words.

2.    The brief has been prepared in proportionally spaced typeface using Word-Perfect 12.0 in Times Roman Font, 14 point.

3.    If the Court so requests, the undersigned will provide an electronic version of the brief and/or a copy of the word count printout.

4.    The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits may result in the Court striking the brief and imposing sanctions against the person signing the brief.

  /s/ James  A. Jones
James A. Jones